# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2011-CA-01833-SCT

*SOUTHERN HEALTHCARE SERVICES, INC.,*
*MEDFORCE MANAGEMENT, LLC d/b/a*
*WILLOW CREEK RETIREMENT CENTER AND*
*DALESON ENTERPRISES, LLC d/b/a JONES*
*COUNTY REST HOME*

*v.*

*LLOYD'S OF LONDON a/k/a UNDERWRITERS*
*AT LLOYD'S OF LONDON AND CERTAIN*
*UNDERWRITERS AT LLOYD'S, LONDON*

| | |
|---|---|
| DATE OF JUDGMENT: | 10/13/2011 |
| TRIAL JUDGE: | HON. JOE N. PIGOTT |
| COURT FROM WHICH APPEALED: | JONES COUNTY CIRCUIT COURT, FIRST JUDICIAL DISTRICT |
| ATTORNEYS FOR APPELLANTS: | DAVID MULLIN |
| | RICHARD BIGGS |
| | DEREK ANDREW HENDERSON |
| ATTORNEYS FOR APPELLEES: | RICHARD O. BURSON |
| | PEELER GRAYSON LACEY, JR. |
| | SHIRLEY M. MOORE |
| NATURE OF THE CASE: | CIVIL - CONTRACT |
| DISPOSITION: | AFFIRMED - 02/21/2013 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**COLEMAN, JUSTICE, FOR THE COURT:**

¶1.     The insureds filed suit against their insurers in the Circuit Court for the First Judicial

District of Jones County, claiming they were unaware their insurance policy had a $250,000

per-claim deductible and alleging that the insurer breached its insurance contract by refusing

to provide a defense until the insureds paid the $250,000 deductible for each of five separate claims. The circuit court granted summary judgment for the insurers and the insureds appeal. We affirm the circuit court's grant of summary judgment.

## FACTUAL BACKGROUND

¶2.     Daleson Enterprises, LLC ("Daleson") operated Jones County Rest Home in Ellisville. Medforce Management, LLC ("Medforce") operated Willow Creek Retirement Center in Byram. Southern Healthcare Services, Inc. ("Southern Healthcare") managed both Daleson and Medforce. Southern Healthcare purchased professional and general liability insurance from Lloyd's of London ("Lloyd's") to cover Daleson, Medforce, and others. Southern Healthcare was the first named insured on the policy. Southern Healthcare, Daleson, and Medforce will be referred to collectively as the "Insureds."

¶3.     In 2001, a previous operator of Jones County Rest Home had purchased an insurance policy from Lloyd's with a $25,000 deductible. An agent at Fox-Everett, Inc. facilitated the purchase. Daleson assumed the operation of Jones County Rest Home in 2002, and the Insureds asked the Fox-Everett agent to obtain an insurance policy similar to the one held by the previous operator. The Fox-Everett agent obtained a policy from Lloyd's in October 2002, and the Insureds claim that they thought the policy was nearly identical to the policy the previous owner had in place. The Insureds contend the Fox-Everett agent informed them their new policy had a higher premium and lower policy limit. Otherwise, the Insureds believed their new policy was identical to the previous one. In fact, the policy had a $250,000 per-claim deductible. The Insureds claim Fox-Everett failed to inform them about the different deductible. They also claim they did not receive a copy of the policy until eleven

2

months after the purchase. The policy was renewed in October 2003. Again, the Fox-Everett agent informed them that the premium was going up, but the Insureds claim the agent said nothing about the $250,000 deductible.

¶4.	In 2003 and 2004, various plaintiffs filed five lawsuits against the Insureds. When each civil action arose, the Insureds notified Lloyd's in accordance with the policy terms. Caronia Corporation ("Caronia") acted as the third-party administrator for Lloyd's, and Caronia sent a reservation of rights ("ROR") letter to the Insureds acknowledging receipt of each claim. Via the ROR letters, Caronia informed the Insureds that "Lloyd's would not provide coverage under the policies until the $250,000 deductibles were paid in full."

¶5.	The ROR letters were standard communications that included claim information, acknowledged receipt of the lawsuit, stated that indemnification and defense would be provided, and set forth any issues that would not be covered under the policy or that would be defended under a reservation of rights. The letters provided the name and contact information of the attorneys Lloyd's had hired to defend the Insureds. Each letter included the following language about the deductible:

> As you are aware, Southern Healthcare Services, Inc., d/b/a Jones County Rest Home [Willow Creek Retirement Center] has a $250,000 deductible for each and every Professional Liability claim. Therefore, the first $250,000 of indemnity and/or claims related expenses will be paid directly by Southern Healthcare Services, Inc., d/b/a/ Jones County Rest Home [Willow Creek Retirement Center].

The Insureds claim they were "thunderstruck" by the above-quoted language regarding the operation of the deductible.

¶6. Caronia sent the ROR letters directly to the nursing homes, rather than to Southern Healthcare. Daleson and Medforce initially paid the attorneys directly until the dispute arose over the deductible. In early 2005, Daleson and Medforce filed for bankruptcy and stopped paying the defense attorneys. They claim they had no choice but to file for bankruptcy because they could not pay the total $1.25 million for the five claims. However, Southern Healthcare did not file for bankruptcy; as the first named insured, Southern Healthcare was the only entity actually responsible for paying the deductible.[1] In March 2005, Lloyd's or Caronia told the lawyers to continue defending and that they would pay the attorneys' fees since the Insureds had filed for bankruptcy. A year later, none of the attorneys' fees had been paid by Lloyd's or Caronia, and the attorneys withdrew. Between December 2006 and August 2007, the defense attorneys were rehired. Lloyd's paid the defense attorneys, and all five suits were settled.

## PROCEDURAL HISTORY

¶7. In August 2006, the Insureds filed suit against Lloyd's, Caronia, and Fox-Everett (collectively the "Insurers") in the Circuit Court for the First Judicial District of Jones County. Against Lloyd's, the Insureds alleged breach of contract for failure to provide

---

[1] Southern Healthcare Services, Inc. is the entity listed under "Name and mailing address of the Insured" on the declarations page of the policy. Endorsement Number 3 indicates that the policy was issued to Southern Healthcare and lists other entities as additional insureds. Endorsement Number 4 also indicates that the policy was issued to Southern Healthcare and lists other entities, including Daleson and Medforce, as premises covered under the policy. The deductible endorsement provides, "The First Named Insured shall be responsible for the deductible amount shown in the Declarations." Southern Healthcare, as the only named insured on the policy, was the entity responsible for paying the deductible.

coverage and defense costs. Against both Lloyd's and Caronia, they alleged fraud and breach of the duty of good faith and fair dealing for misrepresenting that the Insureds had to pay the deductibles in full before they were entitled to coverage. Against Fox-Everett, they asserted breach of contract, breach of fiduciary duty, negligent misrepresentation, and gross negligence for allegedly procuring the policy without informing the Insureds of the $250,000 deductible.

¶8. Lloyd's counterclaimed, alleging breach of contract against Southern Healthcare and seeking a declaratory judgment that Southern Healthcare must pay the $250,000 deductible for each of the underlying suits. After settling the underlying claims, Lloyd's moved for summary judgment on the Insureds' claims against it and Caronia. Lloyd's also moved for summary judgment on its counterclaim. The trial judge, Judge Robert G. Evans, found no issues of material fact and granted Lloyd's summary judgment. The ruling required the Insureds to reimburse Lloyd's in the amount of $701,153.54 for the costs of defense and settlement that fell within the per-claim deductible. Pursuant to Rule 54(b) of the Mississippi Rules of Civil Procedure, the trial judge entered a final judgment as to the Insureds' claims against Lloyd's and Caronia on March 26, 2008. The trial judge entered a final judgment as to Lloyd's counterclaim against Southern Healthcare on July 11, 2008. The Insureds' claims against Fox-Everett were not part of the summary judgment.

¶9. The Insureds appealed, and the case was assigned to the Court of Appeals. The Court of Appeals dismissed the appeal as improperly certified because the claims against Fox-Everett had not been disposed of, and it found those claims to be "intertwined" with the claims for damages. *S. Healthcare Servs., Inc. v. Lloyd's of London*, 20 So. 3d 84, 88 (¶ 14)

5

(Miss. Ct. App. 2009). The majority did not address the propriety of summary judgment. Four judges dissented, writing that the appeal should not have been dismissed because the claims against Fox-Everett were not relevant to the claims against Lloyd's and Caronia and the appeal was properly before the court. *Id.* at 92 (¶¶ 33-34). In addition, the dissenting judges would have reversed the trial court's grant of summary judgment and remanded for a trial on the merits. *Id.* at 99 (¶ 63).

¶10.    On remand, the Insureds filed a motion to reconsider summary judgment. Judge Evans died before the motion could be considered, and Judge Joe N. Pigott was appointed as Special Judge to preside over the case. Judge Pigott scheduled a hearing on the motion to reconsider summary judgment and for a status conference on March 10, 2011. At the hearing, Judge Pigott vacated the summary judgments granted by Judge Evans, directed the parties to proceed with discovery, and set a trial date.

¶11.    Following the March 10th hearing, the litigation continued as though all parties were again in the suit and proceeding to trial in September. At a hearing on a motion to compel discovery held on June 16, 2011, Judge Pigott did not remember vacating the summary judgments, and an order had not been entered vacating them. However, an order dated August 16, 2011, *nunc pro tunc* to March 10, 2011, is in the record.

¶12.    On September 29, 2011, the parties were before Judge Pigott at a hearing on another motion to compel and a motion for leave to amend the complaint. At the hearing, Judge Pigott reinstated the grants of summary judgment in favor of Lloyd's and Caronia, finding that they were never reversed and were still in effect. Judge Pigott said Fox-Everett was the only defendant left in the case, and the Insureds were to proceed to trial against Fox-Everett

6

only. He denied the Insureds' motion to amend the complaint, because the amendments pertained only to Lloyd's. Judge Pigott entered new final judgments dismissing the Insureds' claims against Lloyd's and Caronia and dismissing Lloyd's counterclaim against the Insureds. After entry of the final judgments, the Insureds filed multiple motions indicating they believed Judge Pigott did not allow their arguments into the record. The Insureds also filed a motion for a new trial, which the trial court denied. Meanwhile, the Insureds settled with Fox-Everett. The Insureds then appealed to this Court regarding Judge Pigott's second, or reinstated, grants of summary judgment in favor of Lloyd's and Caronia.

## DISCUSSION

¶13. On appeal, the Insureds assert several arguments based on alleged procedural errors by the second trial judge, Judge Pigott. The Insureds' motion to reconsider summary judgment should not have been granted, and because Judge Pigott later reinstated the original grants of summary judgment, the Insureds are in the same place they were when they first appealed in 2008.

¶14. "How a court treats a motion for reconsideration turns on the time at which the motion is served." *Carlisle v. Allen*, 40 So. 3d 1252, 1260 (¶ 33) (Miss. 2010) (quoting *Cannon v. Cannon*, 571 So. 2d 976, 978 n.2 (Miss. 1990)). If it is filed within ten days of entry of the judgment, it is considered a Rule 59(e) motion to alter or amend the judgment. *Id.* If it is filed more than ten days after the judgment is entered, it is considered a motion for relief under Rule 60(b). *Id.* The motion for reconsideration at issue did not state that it was brought under Rule 59, and it was filed two years after the motions for summary judgment were granted.

7

Thus, it should have been considered a motion for relief under Rule 60(b). Rule 60(b) provides the following:

> **(b) Mistakes; Inadvertence; Newly Discovered Evidence; Fraud, etc.** On motion and upon such terms as are just, the court may relieve a party or his legal representative from a final judgment, order, or proceeding for the following reasons:
>
> (1) fraud, misrepresentation, or other misconduct of an adverse party;
> (2) accident or mistake;
> (3) newly discovered evidence which by due diligence could not have been discovered in time to move for a new trial under Rule 59(b);
> (4) the judgment is void;
> (5) the judgment has been satisfied, released, or discharged, or a prior judgment upon which it is based has been reversed or otherwise vacated, or it is no longer equitable that the judgment should have prospective application;
> (6) any other reason justifying relief from the judgment.
>
> The motion shall be made within a reasonable time, and for reasons (1), (2) and (3) not more than six months after the judgment, order, or proceeding was entered or taken. . . .

Miss. R. Civ. P. 60(b). The motion at hand was filed more than six months after the final judgment was entered, so it could not have been based on reasons (1), (2), or (3). *Id.* The Insureds did not assert that the judgment was void or that it had been satisfied, released, or discharged subject to reasons (4) or (5). *Id.* Thus, the motion could have been granted only for "any other reason justifying relief" under reason (6). *Id.* Regarding Rule 60(b)(6), this Court has explained:

> "Relief under Rule 60(b)(6) is reserved for extraordinary and compelling circumstances," and the rule is a "grand reservoir of equitable power to do justice in a particular case." ***Briney v. U.S. Fid. & Guar. Co.***, 714 So. 2d 962, 966 (Miss. 1998). The determination of whether a Rule 60(b)(6) motion has been made within a reasonable time is considered on a case-by-case basis. Miss. R. Civ. P. 60(b); ***Cucos,*** [***Inc. v. McDaniel***,] 938 So. 2d [238,] 245

[(Miss. 2006)]. The following factors are relevant in adjudicating a Rule 60(b)(6) motion:

> (1) That final judgments should not lightly be disturbed; (2) that the Rule 60(b) motion is not to be used as a substitute for appeal; (3) that the rule should be liberally construed in order to achieve substantial justice; (4) whether the motion was made within a reasonable time; (5) [relevant only to default judgments]; (6) whether if the judgment was rendered after a trial on the merits – the movant had a fair opportunity to present his claim or defense; (7) whether there are intervening equities that would make it inequitable to grant relief; and (8) any other factors relevant to the justice of the judgment under attack.

*M.A.S. v. Miss. Dep't of Human Servs.*, 842 So. 2d 527, 530 (Miss. 2003) (citing *Briney*, 714 So. 2d at 968).

*Carpenter v. Berry*, 58 So. 3d 1158, 1162 (¶ 18) (Miss. 2011). This Court has also said that "Rule 60(b) motions should be denied where they are merely an attempt to relitigate the case." *M.A.S. v. Miss. Dep't of Human Servs.*, 842 So. 2d 527, 530 (¶ 12) (Miss. 2003) (quoting *Stringfellow v. Stringfellow*, 451 So. 2d 219, 221 (Miss. 1984)).

¶15.   Of the factors relevant to this case, we emphasize that "final judgments should not lightly be disturbed" and that a "Rule 60(b) motion is not to be used as a substitute for appeal." *Carpenter*, 58 So. 3d at 1162 (¶ 18). We also consider the timeliness of the motion. The trial court's original order granting summary judgment was entered on March 19, 2008. The Insureds' motion to reconsider summary judgment was filed on July 13, 2010, more than two years later and after the case had been remanded. The Court of Appeals remanded the case for the sole purpose of adjudicating the claims against Fox-Everett, not to relitigate the summary judgment issues. The Insureds' motion to reconsider summary judgment was procedurally improper, because the summary judgment issues should have been considered

9

on appeal once it was properly before the Court of Appeals. Filing a motion to reconsider while the case was on remand was an attempt to relitigate the issues and circumvent the appeals process.

¶16. Taking into account the above-listed factors, as well as this Court's rule that Rule 60(b) motions should not be used to relitigate cases, we find that the motion should not have been granted. Regardless, Judge Pigott later reversed his decision, reinstated the initial grants of summary judgment, and adopted the first judge's findings of fact and conclusions of law.[2] Any alleged procedural errors pertaining to the motion to reconsider will not be considered by this Court because, ultimately, Judge Pigott did not consider that motion or any pleadings filed after that time. This Court will consider only the original summary judgment motions and supporting documents considered by the first trial judge prior to his granting summary judgment in 2008. There is no indication that Judge Pigott reviewed any additional evidence prior to entering the second final judgments that this Court would need to consider. The parties find themselves in the same position now that they were in when they appealed to the Court of Appeals, except the issues with Fox-Everett have been resolved, and that is where this Court will begin.

---

[2] In his order granting summary judgment, Judge Pigott explained that "by vacating the final judgments and orders granting both motions for summary judgment, this [c]ourt effectively took both motions under advisement." Then, after extensively reviewing the court file and transcripts of the hearings, Judge Pigott determined that the granting of both motions had been proper. As support for granting the motions (or reinstating the prior grant of summary judgment), he adopted and incorporated Judge Evans's findings of facts and conclusions of law.

¶17.    This Court has framed the issues as follows: (1) whether the trial court's original grant of summary judgment on the Insureds' claims against Lloyd's was proper; and (2) whether the trial court's original grant of summary judgment on Lloyd's counterclaim was proper. Summary judgment is appropriate if "there is no genuine issue as to any material fact." Miss. R. Civ. P. 56(c). A *de novo* standard of review is applied to a circuit court's grant or denial of summary judgment. ***Kilhullen v. Kan. City S. Ry.***, 8 So. 3d 168, 174 (¶ 14) (Miss. 2009). This Court views the evidence "in the light most favorable to the party against whom the motion has been made." ***Id.*** (quoting ***Daniels v. GNB, Inc.***, 629 So. 2d 595, 599 (Miss. 1993)). However, the opposing party "may not rest upon the mere allegations or denials of his pleadings, but his response . . . must set forth specific facts showing that there is a genuine issue for trial." Miss. R. Civ. P. 56(e).

## I.    Whether the trial court's grant of summary judgment on the Insureds' claims against Lloyd's and Caronia was proper.

¶18.    The trial judge granted summary judgment in favor of Lloyd's and Caronia, finding the two entities had performed their duties under the contract and no dispute of material fact existed. The Insureds were ordered to reimburse Lloyd's in the amount of $701,153.54 for defense costs and settlements that fell within the per-claim deductible. The Insureds claim that summary judgment was not proper because Lloyd's breached its duty of good faith and fair dealing by "conditioning coverage on prepayment of the deductible."

### A. Whether the Insureds were subject to the deductible.

¶19.    First, the Court must determine if the terms of the deductible were clear and unambiguous, such that the Insureds were subject to the deductible. The law pertaining to

11

interpretation and enforcement of insurance policies is well-established. Interpretation of an insurance policy presents a question of law, which the Court reviews *de novo*. ***Farmland Mut. Ins. Co. v. Scruggs***, 886 So. 2d 714, 717 (¶ 10) (Miss. 2004). "[W]hen the words of an insurance policy are plain and unambiguous, the court will afford them their plain, ordinary meaning and will apply them as written." ***Noxubee County Sch. Dist. v. United Nat'l Ins. Co.***, 883 So. 2d 1159, 1165 (¶ 13) (Miss. 2004). Mere disagreement as to the meaning of a policy provision does not render the policy ambiguous. ***U.S. Fid. & Guar. Co. of Miss. v. Martin***, 998 So. 2d 956, 963 (¶ 13) (Miss. 2008). A policy, or provision therein, is ambiguous if it "can be logically interpreted in two or more ways." ***Id.*** The policy must be considered as a whole, "consider[ing] all relevant portions together." ***J&W Foods Corp. v. State Farm Mut. Auto. Ins. Co.***, 723 So. 2d 550, 552 (¶ 8) (Miss. 1998).

¶20.    Insurance policies are contracts, and where the terms of an insurance policy are ambiguous, the rules of contract interpretation and construction will be applied. ***Krebs v. Strange***, 419 So. 2d 178, 181 (Miss. 1982).[3] "The most basic principle of contract law is that contracts must be interpreted by objective, not subjective standards. A court must effect a determination of the meaning of the language used, not the ascertainment of some possible but unexpressed intent of the parties." ***Simmons v. Bank of Miss.***, 593 So. 2d 40, 42-43

---

[3] Generally, "[j]udicial review and interpretation of a contract involves a three-step analysis." ***Epperson v. SOUTHBank***, 93 So. 3d 10, 16 (¶ 16) (Miss. 2012) (internal citations omitted). In a summary judgment case, however, it is not necessary for the Court to go through the entire analysis. "[T]he reviewing Court need not go through the entire three-step analysis; the Court should determine only whether the contract is ambiguous." ***Id.*** at 17 (¶ 20). If the Court finds the contract to be ambiguous, "the case must be submitted to the trier of fact, and summary judgment is not appropriate." ***Id.***

(Miss. 1992) (quoting ***Cherry v. Anthony, Gibbs, Sage***, 501 So. 2d 416, 419 (Miss. 1987)). "[T]he intention of the parties to the insurance contract should be determined based upon what a reasonable person placed in the insured's position would have understood the terms to mean." ***J&W Foods***, 723 So. 2d at 552 (¶ 9). Ambiguities should be resolved in favor of the insured, the nondrafting party. ***Noxubee County***, 883 So. 2d at 1165 (¶ 13). "Exclusions and limitations on coverage are also construed in favor of the insured. Language in exclusionary clauses must be 'clear and unmistakable,' as those clauses are strictly interpreted. Nevertheless, 'a court must refrain from altering or changing a policy where terms are unambiguous, despite resulting hardship on the insured.'" ***U.S. Fid. & Guar.***, 998 So. 2d at 963 (¶ 13) (internal citations omitted).

¶21.    Pursuant to the policy, the Insureds bore responsibility for a $250,000 deductible on any general or professional liability claim, and defense costs were to be included in that amount. Specific terms pertaining to the deductible were found throughout the policy. The following policy provisions relate to the duties of the insurer and the insured in the event of a claim:

> In Consideration of the payment of the premium and in reliance upon the statements in the Application, which is attached hereto and made a part of this Policy, and upon the Declarations, **we** agree as follows[:]

> *I. INSURING AGREEMENT*

> **We** will pay those amounts that **you** are legally required to pay others as damages resulting from a **medical incident** arising out of **professional services** provided by any Insured. . . .

> In addition to **our** Limit of Insurance **we** will also pay **defense costs**. **We** have the right and duty to defend and appoint an attorney to defend any **suit** against an Insured for a covered claim, and we will:

13

    1.  Do so even if any of the charges of the claim are groundless, false[,] or fraudulent; and

    2.  Investigate and settle any claim or **suit** to the extent **we** believe is appropriate.

(Underline added; other emphasis in original.)

¶22.   The Declarations Page provided that the limit of insurance for a general or professional liability claim was $500,000 per claim. Item 3 on the Declarations Page was titled "**Deductible**" in bold font and provided: "General Liability/Professional Liability: $250,000 each claim, <u>Defense Costs included</u>." (Underline added.) The Declarations Page was signed by a representative of the Insureds. The insurance agreement was subject to the following relevant conditions:

> ***VI. CONDITIONS***
>
> In addition to the GENERAL POLICY PROVISIONS AND CONDITIONS – Section III. CONDITIONS APPLICABLE TO ALL COVERAGE PARTS, the following Conditions apply to this Coverage Part:
> . . .
> B. Assistance and Cooperation
>
> The Insured shall:
>     1.  Cooperate with **us** in the investigation, settlement, or defense of the claim or **suit**; and
>     2.  Assist **us**, upon **our** request, in the enforcement of any right against any person or organization which may be liable to the Insured because of injury or damage to which this insurance may also apply.

(Emphasis in original.) Endorsement Number 1 was attached to the front of the policy, and it provided:

> Section **V. DEDUCTIBLE** of the **HEALTHCARE PROFESSIONAL LIABILITY CLAIMS MADE COVERAGE PART FOR LONG TERM CARE FACILITIES** is deleted in its entirety and replace[d] with the following:

**V. DEDUCTIBLE**

A. The First Named Insured shall be responsible for the deductible amount shown in the Declarations, WHICH DEDUCTIBLE AMOUNT SHALL BE IN ADDITION TO AND SHALL NOT ERODE THE APPLICABLE LIMITS OF INSURANCE SHOWN IN THE DECLARATIONS. Expenses **we** incur in the investigating and defending claims and **suits** are included in the deductible. The deductible applies to each **medical incident** . . . .

B. The deductible aggregate is the total amount of damages arising out of the deductibles for all occurrences during the policy period.

C. **We** may pay all or part of the deductible to settle a claim or suit. The First Named Insured agrees to repay **us** promptly after **we** notify the First Named Insured of the Settlement.

(Underline added; other emphasis in original.)[4] Endorsement Number 1 was signed by a representative of the Insureds.

¶23.    The Deductible Liability Insurance Endorsement included a schedule of the applicable deductibles, showing a $250,000 per-claim deductible for medical incidents. It included the following provision:

**APPLICATION OF ENDORSEMENT**

A. Our obligation under the Bodily Injury Liability, Property Damage Liability, Medical Expense[,] and Medical Incident Coverages to pay damages on your behalf applies only to the amount of damages in excess of any deductible amounts stated . . . .
. . .
C. The terms of the insurance, including those with respect to:

   1. Our right and duty to defend the Insured against any "suits" seeking those damages; and

---

[4] An almost identical provision was included pertaining to the Healthcare General Liability Claims Made Coverage.

2. Your duties in the event of an "occurrence[,]" "claim[,]" "suit[,]" or "medical incident" <u>apply irrespective of the application of the deductible amount</u>.

D. <u>We may pay any part or all of the deductible amount to effect settlement of any claim or "suit" and, upon notification of the action taken, you shall promptly reimburse us for such part of the deductible</u> amount as has been paid by us.

(Underline added.) According to the terms set forth here, taken together and read as a whole, we find that the Insureds were subject to the deductible, and the Insurers' duty to provide coverage for damages applied <u>after</u> the deductible was met. According to the Declarations, the deductible <u>included defense costs</u>. The Insurers had a duty to retain counsel and participate in the defense, but the Insurers' duty to pay defense expenses did not arise until the deductible had been met.

¶24. The Insureds claim that, when they obtained the first policy from Lloyd's, the Fox-Everett agent failed to tell them about the deductible. They also claim that they did not receive a copy of the policy until eleven months after purchasing it. They did, however, receive that copy prior to renewing the policy in 2003, and the 2003 policy is the one at issue. Therefore, even if the Insureds did not know about the deductible the first year, by the time they renewed the policy in 2003, they had a copy of it, and they should have known about the deductible before they renewed. In light of the numerous references to the deductible throughout the policy, with several pages referencing the deductible signed by the Insureds, the Insureds cannot argue that they were unaware of the deductible when they renewed the policy in 2003.

16

¶25. The Insureds may have signed the policy and endorsements without reading them, but failure to read the policy is not a valid reason for not knowing its contents. Under Mississippi law, "a contracting party is under a legal obligation to read a contract before signing it," and "a person is charged with knowing the contents of any document that he executes." ***Terminix Int'l, Inc. v. Rice***, 904 So. 2d 1051, 1056 (¶ 18) (Miss. 2004) (internal citations omitted). Further, where one has a duty to read a contract before signing it, he will not "be heard to complain of an oral misrepresentation the error of which would have been disclosed by reading the contract." ***Godfrey, Bassett & Kuykendall Architects, Ltd. v. Huntington Lumber & Supply Co., Inc.***, 584 So. 2d 1254, 1257 (Miss. 1991) (internal citations omitted). As a matter of law, we presume that the Insureds read the policy and saw the terms setting forth the $250,000 deductible. Therefore, the Insureds' claim that they did not know of the deductible cannot stand. This Court will not reject or refuse to enforce certain policy terms simply because one party claims not to know of the terms. *See **Terminix***, 904 So. 2d at 1056 (¶ 18).[5]

¶26. The policy at issue, taken as a whole, was unambiguous, and it subjected the Insureds to the $250,000 deductible. The deductible included defense costs. According to the express terms of the policy, the deductible had to be exhausted before the Insurers incurred responsibility for damages or were required to pay defense costs. The Insureds were not required to pay up-front the entire $250,000 for each claim, as they assert, but they had to

---

[5] The Insureds do not claim that the deductible was unconscionable or that they signed the contract under duress, nor do they assert any other defense except that they simply did not know about the deductible.

pay defense costs and expenses as incurred. This is exactly what the Insurers explained in the ROR letters, and this is the premise under which the Insurers operated. We must now determine whether there were any genuine issues of material fact regarding the Insurers' duties that should have precluded summary judgment.

**B. Whether the Insurers fulfilled their duties under the contract.**

¶27.    The Insureds argue that the trial court's grant of summary judgment was improper because Lloyd's breached its contractual duties under the policy, as well as its fiduciary duties of good faith, fair dealing, and reasonable care by conditioning coverage on payment of the deductible.

¶28.    An insurer has an absolute duty to defend those claims against the insured covered by the insurance policy. *Moeller v. Am. Guar. & Liab. Ins. Co.*, 707 So. 2d 1062, 1069 (Miss. 1996). This Court has said the following about an insurer's duty to defend:

> In Mississippi, an insurance company's duty to defend its insureds derives neither from common law nor statute, but rather from the provisions of its policy, that is, its insurance contract with its insured. It is a matter of contractual agreement. Absent a higher obligation created by statute, an insurance company's duty to defend is neither greater nor broader than the duty to comply with its other contractual obligations. That is not to say an insurance company can ignore its duty to defend where it has agreed to defend its insureds for covered claims, and the allegations of a complaint reasonably bring a claim within the coverage of its policy. The duty of good faith and fair dealing attends all contracts interpreted under Mississippi law. *See* Miss. Code Ann. § 75-1-203; *University of Southern Mississippi v. Williams*, 891 So. 2d 160, 170 (Miss. 2004).
>
> An insurance company's duty to defend its insured is triggered when it becomes aware that a complaint has been filed which contains reasonable, plausible allegations of conduct covered by the policy. However, no duty to defend arises when the claims fall outside the policy's coverage. . . .

***Baker Donelson Bearman & Caldwell, P.C. v. Muirhead***, 920 So. 2d 440, 450-51 (¶¶ 40-41) (Miss. 2006) (internal citations omitted) (emphasis added). This Court recently summarized an insurer's fiduciary duties as follows:

> We consistently have held that an insurer must act in the best interest of the insured. In ***State Farm*** [***Mutual Automobile Insurance Company v. Allstate Insurance Company***, 255 So. 2d 667 (Miss. 1971)], we held that State Farm "was under a solemn obligation to defend its insured, to negotiate and settle all claims made against its insured, first according to [the insured's] best interest, and then, secondly, according to State Farm's best interest." ***State Farm***, 255 So. 2d at 669. We have said that "the insurer has a fiduciary duty to look after the insured's interest at least to the same extent as its own," and in evaluating a settlement offer, the insurer must "make a knowledgeable, honest[,] and intelligent evaluation of the claim[.]" ***Hartford Accident & Indem. Co. v. Foster***, 528 So. 2d 255, 265 (Miss. 1988) . . . .
>
> An insurer has a duty to protect the interests of its insured, "which includes the duty to settle claims within the policy limits on objectively reasonable terms." ***Jordan v. U.S. Fid. & Guar. Co.***, 843 F. Supp. 164, 171 (S.D. Miss. 1993) (citing ***Hartford***, 528 So. 2d at 282)) . . . .

***Indem. Ins. Co. of N. Am. v. Guidant Mut. Ins. Co.***, 99 So. 3d 142, 150-51 (¶¶ 23-24) (Miss. 2012).

¶29. The Insureds rely on ***Baker Donelson***, ***Moeller***, and similar cases to claim that the Insurers had an absolute duty to defend. First, the cases cannot be read in a vacuum. There is no indication that the policies in ***Baker Donelson*** or ***Moeller*** included a deductible, so the principles therein cannot be strictly applied without taking into account the terms of the specific policies at issue. Second, ***Baker Donelson*** specifically says that the insurer's duty to defend derives from the insurance policy. ***Baker Donelson***, 920 So. 2d at 450. According to the terms of the instant policy, the Insurers had a duty to retain counsel and participate in

the defense, but the Insurers' duty to pay for the defense did not arise until the Insureds

exhausted the deductible.

¶30.    As with any deductible, the insured is required to expend the amount of the deductible

before coverage becomes available. An insurer's duty to indemnify is not triggered until the

deductible has been paid. And where the policy specifies that defense costs are included in

the deductible, the insurer is not responsible for defense costs until the deductible has been

paid. One treatise has explained insurance deductibles and self-insured retentions as follows:

> In the absence of a statute or controlling policy language, the insurer's duty to indemnify is excess over the sum of money that is owed by the insured – whether that sum of money is called a deductible or a retention. *E.g., Hocker v. New Hampshire Ins. Co.*, 922 F.2d 1476, 1482 n.4 (10th Cir. 1991) (a "retained limit" is "in effect, a deductible"). The insurer does not cover that part of the loss. The same should be true with regard to the payment of defense costs unless the insurer has a duty to defend and such duty is triggered under the terms of the policy despite the existence of an unpaid deductible or retention.

Allan D. Windt, 3 *Ins. Claims & Disputes* § 11:31 (5th ed. 2012). A deductible is, by

definition, "the portion of the loss to be borne by the insured before the insurer becomes

liable for payment." *Black's Law Dictionary* 185 (3d pocket ed. 2006). The Fifth Circuit,

applying Mississippi law, gave the following "common understanding of how deductibles

operate in insurance policies":

> The purpose of a deductible is to shift some of the insurer's risk (that is, covered risk) to the insured, which is accomplished by setting a limit on the value of covered losses below which the insurer is not obligated to pay. *See* 12 Couch on Ins. 3d § 178:1 ("A provision commonly found in automobile collision policies is the so-called 'deductible clause,' whereby a stated sum is deductible from the *amount for which the insurer would otherwise be liable*." (emphasis added)); *see also* Webster's Third New International Dictionary 589 (1993) (defining a "deductible" as "a clause in an insurance policy relieving

20

the insurer of responsibility for an initial specified small loss *of the kind insured against*." (emphasis added)).

***Penthouse Owners Ass'n, Inc. v. Certain Underwriters at Lloyds, London***, 612 F.3d 383, 387 (5th Cir. 2010).

¶31.    Although deductibles and self-insured retentions ("SIR") generally serve the same purpose – to shift a portion of the risk from the insurer to the insured – they are different creatures. ***Boston Gas Co. v. Century Indem. Co.***, 910 N.E.2d 290, 294 n.8 (Mass. 2009). A SIR is just what its name implies, a form of self insurance. With a SIR, the insured is usually responsible for its own defense until the SIR is exhausted. ***Id.*** (quoting A.D. Windt, 2 *Ins. Claims & Disputes* § 11:31, 11-495 (5th ed. 2007)). Where a policy is subject to a SIR, the insurer is more like an excess insurer, and the insurer's duty to defend and indemnify is not triggered until the SIR is exhausted. With a deductible, on the other hand, the insurer usually has a duty to defend upon receipt of notice of the claim. (However, in this case, the policy states that defense costs are included in the deductible. So the deductible here operates more like a SIR, and the Insurers have no duty to pay for the defense until the deductible is exhausted. Still, the Insurers have the option to pay for the defense and/or settle the claim, and then seek reimbursement from the insureds.)

¶32.    The Insureds base much of their argument on appeal on the dissenting opinion from the Court of Appeals. The dissenting judges opined that the policy did not require "prepayment" of the deductible as a *condition* to providing a defense; they quoted the following policy terms in support of their position:

> SUPPLEMENTARY PAYMENTS AND DEFENSE COSTS WITHIN THE LIMITS OF LIABILITY

> Subject to the Deductible Liability Insurance Endorsement provisions of this policy, it is agreed that we will pay the following Supplementary Payments and Defense Costs, which will be included within, not in addition to and will erode the Limits of Liability of the policy.
>
> A. all expenses incurred by us, all costs taxed against you in any suit defended by us . . .
>
> . . .
>
> D. reasonable expenses incurred by you at our request in assisting us in the investigation or defense of any claim or suit, including actual loss of earnings;
>
> E. all defense costs, which shall mean all costs of investigation, adjustment and defense of claims, including court costs, interest on judgments, premiums on bonds and legal fees arising directly from claims covered by this policy . . . provided such claims expenses are incurred by or with our prior written permission.

(Underline added.) The dissent wrote, "This endorsement contains no provision requiring prepayment of the deductible as a condition for providing a defense to the Appellants, as required by the contract." *S. Healthcare*, 20 So. 3d at 95 (¶ 44) (Griffis, J., dissenting).

¶33. The dissenting judges and the Insureds may have misunderstood the ROR letters and thought the Insurers required "prepayment" of the entire deductible amount before the Insurers would do anything regarding the claims. If such were the case, then the dissent was correct. However, the Insureds were <u>not</u> required to pay the entire deductible amount up front. That is not required under the policy, and it was not required by the Insurers. However, the Insureds were required to pay costs and expenses on an *ongoing* basis, up to the point that the deductible was exhausted. The policy clearly says that the supplementary payments listed above, including defense costs, are "[s]ubject to the Deductible Liability Insurance Endorsement," which provides the $250,000 per-claim deductible. Further, full payment of

22

the deductible was not a *condition* to the Insurers providing a defense, because the Insurers were involved in the defense, and they had the right to pay defense costs and settle the claim even if the deductible was not paid. It is clear from the terms above that the Insurers intended to participate in the defense. However, the attorneys' fees would have to be paid by the Insureds up to the deductible amount.

¶34. The Deductible Liability Insurance Endorsement, under the "Application of Endorsement" section, provides that the Insurers' obligation "applies only to the amount of damages in excess of any deductible amounts." It also provides that the terms of the insurance with respect to the Insurers' "right and duty to defend . . . apply irrespective of the application of the deductible amount." In its defense of a claim, the Insurer can "pay any part or all of the deductible amount" to settle a claim, but the Insureds must reimburse the Insurer for any part of the deductible amount the Insurer pays. The Insurer does have a duty to defend – according to Mississippi law and the policy at issue – but the Insureds must still pay attorneys' fees up to the amount of the deductible.

¶35. Regarding the Deductible Liability Insurance Endorsement (set forth, *supra*, ¶ 23), the dissent implied that defense costs were not included in the deductible because the endorsement did not "define defense expenses as damages." ***S. Healthcare***, 20 So. 3d at 95 (¶ 46) (Griffis, J., dissenting). The policy repeatedly states that defense costs are <u>included</u> in the deductible and that the amount the Insurers will pay for defense costs is <u>subject to</u> the deductible. The Insurers have a duty to be involved in the defense upon notice of the claim, but the Insurers are not required to pay defense costs until the deductible has been exhausted.

¶36. The Insurers did not breach any contractual or fiduciary duties to the Insureds. The Insurers did not deny coverage as the Insureds contend. The Insurers exercised their right to provide a defense while reserving their right to deny coverage for claims that may not be covered under the policy. The Insurers certainly have the right to provide a defense under a reservation of rights. *See Moeller*, 707 So. 2d at 1069. They also exercised their right under the policy to advance part of the deductible amount to settle the claims. In fact, all of the claims were settled or dismissed between December 2006 and August 2007. Of the four claims that were settled, three were settled for less than the deductible amount.

¶37. The Insureds operated subject to the $250,000 per-claim deductible, and the Insureds were required to pay defense costs and expenses as they came due until they exhausted the deductible. The Insurers retained counsel and participated in the defense, ultimately settling all of the claims and advancing the settlement amounts. The Insurers did not breach any contractual or fiduciary duties, and the Insureds failed to show the existence of any genuine issues of material fact that should have precluded summary judgment.

### C. Whether Lloyd's breached its duties by failing to timely settle the Huffmaster claim.

¶38. The Insureds take specific exception to the Insurers' handling of the Huffmaster claim. The Insurers argue that this claim was waived because the Insureds did not raise it in their original Complaint. The specific claim regarding the Huffmaster lawsuit was not in the original Complaint, and this Court will not consider claims raised for the first time on appeal, as those claims are procedurally barred. *Fowler v. White*, 85 So. 3d 287, 293 (Miss. 2012); *Triplett v. Mayor and Bd. of Aldermen of Vicksburg*, 758 So. 2d 399, 401 (Miss. 2000).

24

However, arguably, the overarching claims of breach of contract and breach of the duty of good faith and fair dealing against the Insurers could encompass the specific claims pertaining to the Huffmaster suit.

¶39. Regardless, the issue is without merit. As discussed above, when a settlement offer is made within the policy limits, an insurer has a duty to "make a knowledgeable, honest[,] and intelligent evaluation of the claim." *Hartford*, 528 So. 2d at 265. However, if the insurer honestly believes the claim has no merit or that its insured is not liable, the insurer is not required to accept a settlement offer simply because it is within the policy limits. The following was said in the *Hartford* case:

> The fact remains that there is nothing in this case supporting bad faith on the part of Hartford's decision not to accept the offer of settlement. There can be no negligence or bad faith attributed to Hartford's *assessment* of the settlement value of this case. Hartford made a realistic evaluation. The only asset of Sims's case was the dreadful injury to his arm. No insurance company should be faulted, however, regardless of the plaintiff's injuries, for not paying a claim when it has every reason to believe its insured was not at fault. In so doing it may upon occasion lose (as Hartford did here), but this is a far more salutary practice than encouraging insurance companies to pay off every dubious claim in which the injuries happen to be serious. Of course, a serious question of *liability coupled* with serious injuries is an entirely different matter. This certainly is not this case.

*Hartford*, 528 So. 2d at 266 (emphasis in original).

¶40. The Huffmaster claim arose in 2003. In mid to late 2004, defense counsel had an indication that Huffmaster's attorneys were "motivated to settle," and she recommended making a settlement offer. The Insurers asked what "a good opening offer" would be, and counsel recommended that the Insurers offer $150,000 in addition to the $250,000 deductible, which the Insureds were willing to contribute. No evidence exists that Huffmaster

25

made a settlement demand, or that talks of settlement went beyond these discussions at that time. Likewise, no evidence exists that the Insurers did anything less than required in regard to an honest, knowledgeable, and intelligent evaluation of the claim. Although the Insurers acknowledged the defense attorney's venue concerns, they apparently found the Huffmaster case to have very little merit. The case ultimately settled for $172,640.64, which was below the discussed settlement amount of $400,000. There is no evidence that the Insurers breached any duty in failing to settle that claim at an earlier time.

¶41. The Insureds have failed to show the existence of genuine issues of material fact that should be reserved for a jury. First, the policy was unambiguous, and the Insureds were subject to the $250,000 per-claim deductible, which included defense costs. Second, the Insurers did not breach any contractual or fiduciary duties; they retained counsel, participated in the defense, settled all of the claims after the Insureds stopped paying defense costs, and advanced the settlement amounts. The trial court did not err in granting summary judgment in favor or Lloyd's and Caronia as to all of the Insureds' claims against them.

## II. Whether the trial court's grant of summary judgment on Lloyd's counterclaim was proper.

¶42. The Insureds claim that summary judgment in favor of Lloyd's on Lloyd's counterclaim was not proper because the Insureds were discharged from liability by Lloyd's breach of contract, and/or the counterclaim was barred by Lloyd's fraud, bad faith, and gross negligence.[6] As discussed in the previous section, the Insurers did not breach any duties owed to the Insureds. Likewise, there was no fraud or gross negligence. The Insureds' claims

---

[6] Notably, the Insureds did not allege negligence against Lloyd's.

26

in this regard are wholly without merit. Therefore, no conduct by the Insurers served to discharge the Insureds from any responsibility. The Insureds are bound by the contract, and they must pay the amount of the deductible owed for each claim according to the terms of the policy. The trial judge did not err in granting summary judgment in favor of Lloyd's on its counterclaim, and the Insureds owe Lloyd's $701,153.54 for the amount Lloyd's expended in the defense and settlement of the claims that fell within the deductible.

## CONCLUSION

¶43.    The language in the insurance policy pertaining to the $250,000 per-claim deductible was clear and unambiguous. The Insurers did not deny a defense or coverage to the Insureds. Rather, the Insurers required the Insureds to pay the $250,000 deductible amount, which included defense costs, as required by the policy. The Insurers fulfilled their duties under the policy. We find no genuine issue of material fact that should have precluded summary judgment. We affirm the trial court's grant of summary judgment in the Insurers' favor on both the Insureds' claims and Lloyd's counterclaim.

¶44.    **AFFIRMED.**

**WALLER, C.J., DICKINSON AND RANDOLPH, P.JJ., LAMAR, KITCHENS, CHANDLER, PIERCE, AND KING, JJ., CONCUR.**