# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2013-CA-01124-SCT

*WILLIAM GRAY, INDIVIDUALLY, AND ON
BEHALF OF THE WRONGFUL DEATH
BENEFICIARIES OF WILLIAM T. GRAY*

*v.*

*ARCH SPECIALTY INSURANCE COMPANY*

| | |
|---|---|
| DATE OF JUDGMENT: | 05/30/2013 |
| TRIAL JUDGE: | HON. THOMAS J. GARDNER, III |
| COURT FROM WHICH APPEALED: | MONROE COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | JASON D. HERRING |
| | MICHAEL S. CHAPMAN |
| ATTORNEYS FOR APPELLEE: | EVERETT WHITE |
| | WILLIAM N. REED |
| | MARLENA P. PICKERING |
| | MONICA A. FROIS |
| NATURE OF THE CASE: | CIVIL - INSURANCE |
| DISPOSITION: | AFFIRMED - 10/23/2014 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE RANDOLPH, P.J., KING AND COLEMAN, JJ.**

**COLEMAN, JUSTICE, FOR THE COURT:**

¶1.    The Monroe County Circuit Court granted summary judgment in favor of Arch Specialty Insurance Company, finding that Arch's general liability policy did not provide coverage for the claims asserted by the wrongful death beneficiaries of William Gray. The Grays' claims of negligent hiring, negligent training, and failure to implement appropriate triage protocols arose from the performance of or failure to perform medical services, which the general liability policy excludes. The Grays appealed. We affirm.

**Factual Background**

¶2.     William Gray was in a car wreck on April 8, 2006, and paramedics employed by Emergystat, Inc. and Southland Health Services, Inc. responded.  William died shortly thereafter.  On April 7, 2009, William's wrongful death beneficiaries (the Grays) filed suit against Emergystat, Southland, and various employees.  The Grays claimed that William was alive when the paramedics arrived and that he "remained alive for one hour before properly being attended, treated[,] and cared for[.]"  They alleged that Emergystat and Southland were negligent in rendering medical care to William, resulting in his death.  They also alleged negligent hiring, negligent training, and failure to implement appropriate triage protocols.  The defendants did not answer the complaint, and the Grays filed an entry of default.

¶3.     Two days before filing the entry of default, the Grays' attorney notified Arch Specialty Insurance Company of the suit and advised that a policy Arch had issued to Emergystat and Southland could be implicated.  Arch investigated the claim and informed Emergystat and Southland that the policy did not provide coverage.  In December 2009, the trial court entered a default judgment against Emergystat and Southland for $1,251,822.  Six months later, the Grays filed a writ of garnishment against Arch in an attempt to collect under the insurance policy.  Arch denied that the Grays were entitled to collect and filed a motion for summary judgment.  The circuit court granted Arch's motion, finding that the policy did not provide coverage.  The Grays appealed.

**Discussion**

¶4.     The issue on appeal is whether the Arch general liability policy, issued to Emergystat and Southland, covers the Grays' claims of negligent hiring, negligent training, and failure to implement appropriate triage protocols.  "The proper construction of an insurance contract

2

provision is a question of law[,] which we review de novo." ***Farmland Mut. Ins. Co. v. Scruggs***, 886 So. 2d 714, 717 (¶ 10) (Miss. 2004) (citation omitted). The Court also reviews a trial court's grant of summary judgment *de novo*. ***S. Healthcare Servs., Inc. v. Lloyd's of London***, 110 So. 3d 735, 743 (¶ 17) (Miss. 2013). Summary judgment is appropriate if the moving party proves "there is no genuine issue as to any material fact." Miss. R. Civ. P. 56(c).

## I. The Arch Insurance Policies

¶5.    Arch issued an umbrella policy to Emergystat and Southland for the period of November 9, 2002, to December 1, 2007. The umbrella policy provided two types of coverage: professional liability and general liability. The Professional Liability Policy was a "claims-made" policy, which afforded coverage for damages arising from "medical professional injury" that resulted "from acts or omissions in the providing of or failure to provide 'health care professional services' by or for an insured." The General Liability Policy covered damages for bodily injury and property damage caused by an "occurrence" during the coverage period, but it specifically excluded damages resulting from "the performance of or failure to perform 'health care professional services.'" The term "health care professional services" had the same definition in both policies. Thus, in Arch's words, the General Liability Policy excluded what the Professional Liability Policy included.

¶6.    Arch moved for summary judgment, claiming that the Grays were not entitled to payment under either policy. Arch maintained that the Professional Liability Policy did not provide coverage because it was a "claims made" policy, which covered only claims made

during the policy period, and the Grays did not make a claim during the policy period.[1] Arch asserted that there was no coverage under the General Liability Policy because William's death was the result of the failure to perform medical services, so the "healthcare professional services" exclusion applied. The circuit court agreed. On appeal, the Grays seek payment under the General Liability Policy only.

¶7.     The allegations in the Grays' complaint became fact when the Grays obtained the default judgment. *Capital One Servs., Inc. v. Rawls*, 904 So. 2d 1010, 1018-19 (¶ 30) (Miss. 2004) (quoting *Journey v. Long*, 585 So. 2d 1268, 1272 (Miss. 1991)). Thus, taking the facts in the complaint as true, it was the paramedics' failure to provide proper medical care that resulted in William's death. The General Liability Policy excludes from coverage "'[b]odily injury' or 'property damage' that result from the performance of or failure to perform 'health care professional services.'" The policy defines "health care professional services" as follows:

a.  Medical, surgical, dental, x-ray, nursing, mental, or other similar health care professional services or treatments.

b.  Providing or dispensing of food, beverages, medications or medical supplies or appliances in connection with services described in Paragraph a. above.

c.  Handling or treatment of dead bodies, including autopsies, organ donation or harvesting, or other procedures.

---

[1] Claims brought under the Professional Liability Policy had to be filed during the policy period (November 9, 2002 – December 1, 2007) to be covered. The Grays filed their complaint on April 7, 2009. Thus, the claims were not covered. The Grays do not dispute the lack of coverage, and they seek payment under the General Liability Policy only.

4

d. The work of your formal accreditation, standards review or equivalent professional board or committee, done for any insured while:

   (1) Evaluating the professional qualifications or clinical performance of any provider of health care professional services; or
   (2) Promoting and maintaining the quality of health care professional services being provided.

e. The execution, or failure to execute, a decision or directive of your formal accreditation, standards review or equivalent professional board or committee.

The paramedics were providing medical services or treatment to William, and their conduct falls under section A of the "health care professional services" exclusion. The Grays do not dispute that section A excludes medical services, but they assert that their claims for negligent hiring and training are not excluded under that section.

## II. Negligent Hiring and Training Claims

¶8. The Grays assert that the "health care professional services" exclusion does not exclude their claims for negligent hiring, negligent training, and failure to implement appropriate protocols. The Grays' argument is difficult to follow, so we quote it verbatim from their brief:

> Section "A" of the "health care professional services" definition does not apply to claims for negligent hiring, negligent training[,] and failure to implement appropriate protocols because Sections "D" and "E", which specifically reference such types of claims, must be given effect since they were included in the drafting of the definition. In the General Policy, Section "D" of the "health care professional services" definition only excludes claims for negligent hiring, negligent training[,] and failure to implement appropriate protocols when the insured has met the required condition to have a formal accreditation, standards review[,] or equivalent professional board or committee involved in its hiring and training process. There was no evidence in the lower court to support any work or involvement of a formal accreditation, standards review[,] or equivalent professional board or

5

committee in the hiring, training[,] or supervising process. Therefore Section "D" does not provide an exclusion to coverage under the General Policy.

To summarize, the Grays maintain that sections D and E are conditional, so that "health care professional services" claims are excluded only if the insured met the requirement of having a formal accreditation, standards review, or an equivalent board involved in its hiring and training process. In the alternative, the Grays argue that section A, which excludes damages resulting from the performance or failure to perform medical services, should not exclude independent causes of action like negligent hiring, training, and supervising. They did not cite any caselaw to support that argument.

¶9.     Arch maintains that a plaintiff's legal theory does not determine the applicability of exclusions; if an exclusion applies, then it applies to all theories of liability. We agree. The Court has held that, if the injury would not have resulted "but for" the excluded service, then the exclusion applies to all theories of liability. *See Meyers v. Miss. Ins. Guar. Ass'n*, 883 So. 2d 10, 16 (¶ 26) (Miss. 2003); *Titan Indem. Co. v. Estes*, 825 So. 2d 651, 656 (¶¶ 18-19) (Miss. 2002). Both *Meyers* and *Titan* dealt with injuries that resulted from automobile accidents, and the policies at issue had auto exclusions. In *Titan*, the Court held:

> Although the Estes family argues that the other proximate causes asserted are not so intertwined with the use or maintenance of the fire engine to fall within the auto exclusion, we disagree. Coverage under the CGL policy should not vary depending upon the theories of liability asserted. This Court will not recognize a strained interpretation of a policy. *Allstate Ins. Co. v. Moulton*, 464 So. 2d 507, 510 (Miss. 1985); *Warren v. United States Fid. & Guar. Co.*, 797 So. 2d 1043, 1045 (Miss. Ct. App. 2001) (quoting *Love v. McDonough*, 758 F. Supp. 397, 402 (S.D. Miss.), *aff'd mem.,* 947 F. 2d 1486 (5th Cir. 1991)).
>
> The Estes family would not have been damaged *but for* the collision between the fire engine and Hailey's vehicle. Therefore, given the clear and

6

unambiguous language of the auto exclusion, the Court finds that the auto exclusion forecloses coverage under the CGL policy. Accordingly, the trial court erred in finding that the CGL policy applied.

*Titan*, 825 So. 2d at 656 (¶¶ 18-19) (emphasis added).  Likewise, in *Meyers*, the Court used the "but for" language in reasoning that coverage was not available under the policy:

> The present GCL policy provides coverage for bodily injury damages but excludes such coverage for damages arising out of the use of an automobile. Meyers contends that the theories of liability asserted, negligent hiring and failure to maintain adequate safety programs[,] allow recovery under the GCL for auto accident injuries despite this auto-exclusion. . . . There is no question that the tractor-trailer truck involved in the present case is an automobile. There is also no question that Meyers would not have been injured *but for* the collision between the truck and his vehicle.
>
> Coverage under a GCL policy with an auto-exclusion for injuries arising out of the use of an automobile "should not vary depending upon the theories of liability asserted." *Titan*[,] 825 So. 2d [at] 656[.] . . .
>
> The controlling case law in Mississippi is clear: claims of negligent entrustment, negligent supervision, and failure to train will not be recognized as independent acts of negligence sufficient to allow coverage under insurance policies, whether homeowners or GCL policies, with an auto-exclusion where the damages arise out of the use of an automobile. *More broadly, application of the exclusion is not dependent on the theory of liability asserted.* [*Love*, 758 F. Supp. at 402]; *Titan*, 825 So. 2d at 656.

*Meyers*, 883 So. 2d at 13-14, 16 (¶¶ 19-20, 26) (emphasis added).  Both *Meyers* and *Titan* cited a case from the Southern District of Mississippi that had addressed the same issue: *Love by Smith v. McDonough*, 758 F. Supp. 397 (S.D. Miss. 1991).

¶10.    In *Love*, the plaintiff's bodily injury arose out of the defendant's daughter's "use of a motor vehicle," so the defendant's homeowner's insurance policy did not cover the plaintiff's claim.  *Love*, 758 F. Supp. at 400.  The court held that the "[p]laintiff's flawed theory is that the bases of liability against [the defendant], negligent entrustment, negligent

7

supervision, and statutory liability pursuant to Section 63-1-25, are unrelated to the use of the automobile by [defendant's daughter]." *Id.* The issue in *Love* was one of first impression, and the southern district court was "*Erie*-bound" to predict how the Mississippi Supreme Court would have ruled. *Id.*[2] That court wrote:

> There is one salient question that is the key to determining whether coverage is provided by policies using exclusions worded as the one before the Court. Did the plaintiff's injuries arise out of the use or ownership of an automobile by an insured? If they did, then there is no coverage under the policy. The Supreme Court of Mississippi has made its position clear that it will not recognize "strained interpretations" of policies in order to create otherwise nonexistent coverage. *Allstate Insurance Co. v. Moulton*, 464 So. 2d 507, 510 (Miss. 1985). The Court, thus, has no reason to believe that the Mississippi Supreme Court would adopt the reasoning urged by [p]laintiff.
>
> . . . The Court reiterates that the subject policy provision clearly and unequivocally excluded coverage for bodily injury arising out of the ownership and use of a motor vehicle owned or operated by any insured. Asserting a different theory of liability to perform an end-run around the exclusion strains the clear and unambiguous language of the provision out of all bounds, and this the Court refuses to do. Application of the exclusion is not dependent on the theory of liability asserted.

*Id.* at 402. Although *Titan*, *Meyers*, and *Love* dealt with automobile exclusions, rather than a health care professional services exclusion, the same rationale applies here.[3]

---

[2] *See* **Erie R.R. Co. v. Tompkins**, 304 U.S. 64 (1938).

[3] At least one Texas court has held that a "health service or treatment" exclusion in a general liability policy precluded coverage for claims of negligent hiring, training, supervision, and failure to institute adequate policies and procedures. **Duncanville Diagnostic Ctr., Inc. v. Atlantic Lloyd's Ins. Co.**, 875 S.W.2d 788, 792 (Tex. App. 1994). Texas courts apply the same principles as Mississippi courts to determine if coverage is afforded: To determine whether an exclusion applies, Texas courts "examine the factual allegations showing the origin of the damages rather than the legal theories asserted by the plaintiff." **Canutillo Indep. Sch. Dist. v. Nat'l Union Fire Ins. Co.**, 99 F.3d 695, 703-04 (5th Cir. 1996) (citations omitted). If a claim "would not exist 'but for' conduct explicitly excluded by the policy, the dependent claims are also not covered under the policy." *Id.* at 704.

8

¶11. Due to the entry of default judgment, the Court takes as true the allegation that William's death resulted from the paramedics' performance of or failure to perform medical services. The General Liability Policy does not provide coverage for claims that arise from health care professional services. The policy is unambiguous; sections D and E are not applicable to the facts at hand, no matter how the Grays framed the issues. The Grays would not have been damaged *but for* the paramedics' failure to provide medical attention, which is an excluded service under section A. Therefore, the exclusion applies to damages arising from the failure to provide medical services regardless of the theories of liability asserted. *See Meyers*, 883 So. 2d at 16; *Titan*, 825 So. 2d at 656. Arch's general liability insurance policy does not cover the Grays' claims for negligent hiring, negligent training, and failure to implement appropriate protocols.

**Conclusion**

¶12. Application of an exclusion in an insurance policy does not depend on the plaintiff's theory of liability. If the injury would not have resulted "but for" the excluded service, then the exclusion applies to all theories of liability. The "health care professional services" exclusion excluded the Grays' claims from coverage. We affirm the circuit court's grant of summary judgment.

¶13. **AFFIRMED.**

**WALLER, C.J., DICKINSON AND RANDOLPH, P.JJ., LAMAR, KITCHENS, CHANDLER, PIERCE, AND KING, JJ., CONCUR.**